UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DONALD SCOTT KNOWLES,

                           Petitioner,                          Case No. 1:14-cv-1024

v.                                                 Honorable Robert J. Jonker

JEFFREY LARSON,

                           Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner, a fourth offense habitual offender, is serving a term of 9 to 75 years, imposed by the Mason County Circuit Court on July 22, 2011, after a jury convicted Petitioner of second-degree home invasion, MICH. COMP. LAWS § 750.110a(3).  In his *pro se* petition, Petitioner raises the following grounds for relief:

        I.      WHETHER THE MICHIGAN COURTS USED AN UNREASONABLE DETERMINATION BY IGNORING LEGALLY RELEVANT FACTS, IN LIGHT OF THE EVIDENCE PRESENTED AND [PETITIONER'S] THEORY OF THE CASE, AS TO WHETHER [PETITIONER] WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL, BY TRIAL COUNSEL'S FAILURE TO REQUEST AN INSTRUCTION ON THE LESSER INCLUDED OFFENSE OF ENTERING WITHOUT PERMISSION, THUS SUBSTANTIALLY AND INJURIOUSLY EFFECTING OR INFLUENCING THE JURY'S DETERMINATION AND IT[]S VERDICT?

        II.     WHETHER THE MICHIGAN COURT OF APPEALS MISAPPLIED THE ESTABLISHED RULE OF LAW TO PETITI[O]NER['] S QUESTION OF WHETHER MR. KNOWLES' CONVICTION SHOULD BE REVERSED, AS HE WAS DENIED A FAIR TRIAL DUE TO THE

TRIAL COURT'S ADMISSION OF UNDULY PREJUDICIAL AND INADMISSIBLE EVID[EN]CE CONCERNING OTHER UNCHARGED, ALLEGED BAD ACTS UNDER MRE 404(b)?[1]

III-A.   WHETHER THE COURT OF APPEALS APPLIED THE WRONG STANDARD OF REVIEW BY IT'S [SIC] FAILURE TO ADDRESS THE PREJUDICIAL EFFECT OF THE TRIAL COURT[']S FAILURE TO UP-HOLD ITS PRIOR RULING ON THE MOTION FOR CHANGE OF VENUE AND THUS, THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING DEFENDANT'S MOTION FOR CHANGE OF VENUE DUE TO PUBLIC SENTIMENTS AND THE COMPELLING AND PREJUDICIAL SPILLOVER OF DEFENDANT'S INVOLVEMENT IN AN ALLEGED 'BOMB THREAT' AND BEING PUBLICALLY EXPOSED TO BEING A 'FOUR TIME HABITUAL OFFENDER' WHICH WAS TELEVISED AND PUBLICIZED THROUGHOUT ALL OF LUDINGTON AND MASON COUNTIES, ALL OF WHICH DENIED DEFENDANT'S DUE PROCESS TO AN IMPARTIAL JURY AS CLEARLY DETERMINED BY SUPREME COURT PRECEDENT AND THE FEDERAL GOVERNING LEGAL STANDARD?

III-B.   WHETHER PETITIONER WAS DENIED AN IMPARTIAL JURY BY THE PREJUDICIAL COMMENTS OF THE PROSECUTION, VOUCHING FOR THE CREDIBILITY / TRUSTWORTHINESS OF WITNESS HELFRICH?

IV.   WHETHER THE COURT OF APPEALS DECISION WAS BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE EVIDENCE PRESENTED IN THE STATE COURT PROCEEDINGS WHERE, THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING DEFENDANT'S MOTION TO DISMISS 'FRUITS OF A POISONOUS TREE' WHICH VIOLATED APPELLANT'S FOURTH AMENDMENT RIGHTS BY EXPOSING THE JURY TO PREJUDICIAL EVIDENCE WHICH WAS OUTCOME DETERMINATIVE AS CLEARLY

---

[1] As part of his second claim of error, Petitioner initially asserted an unexhausted claim: he "was denied effective assistance of trial counsel because of counsel's failure to conduct and complete an investigation into the Helfrich testimony." (Pet., ECF No. 1, PageID.13.)  Because the ineffective-assistance-of-counsel claim was not exhausted, the Court dismissed the petition for lack of complete exhaustion.  (*See* ECF No. 3.) Petitioner thereafter filed a motion for relief from judgment in this Court (ECF No. 6), asserting he had intended to raise only exhausted claims in his habeas petition.  Based on Petitioner's representation that he did not intend to pursue the unexhausted claim of ineffective assistance of counsel, Chief Judge Jonker granted Petitioner's motion, vacated the prior judgment, and ordered Respondent to file an answer or other pleading.  (ECF No. 7-9.)  Because Petitioner has abandoned his unexhausted claim, the Court will review only the exhausted claims.

ESTABLISHED BY SUPREME COURT PRECEDENT AND THE FEDERAL GOVERNING LEGAL STANDARD?

(Pet., ECF No. 1, PageID.11-20.)  Respondent has filed an answer to the petition (ECF No. 13) stating that grounds I and II are without merit, grounds III-A and III-B are procedurally defaulted, and ground IV is not cognizable on habeas review.  Upon review and applying the AEDPA standards, I find that Petitioner's grounds I and II are without merit, grounds III-A and III-B are both procedurally defaulted and without merit, and Ground IV is noncognizable.  Accordingly, I recommend that the petition be denied.

**Procedural History**

### A.    Trial Court Proceedings

Petitioner's charges stem from the October 29, 2010, home invasion of Martin and Cheryl Schilling's residence in Branch Township.  Petitioner was charged with one count of second-degree home invasion, as well as being a fourth-offense habitual offender.  Following a preliminary examination on December 8, 2010, Petitioner was bound over to the Mason County Circuit Court on the charges.  Petitioner was tried before a jury beginning July 20, 2011, and concluding on July 22, 2011.

Martin Schilling testified that he lived with his wife at their residence on North Campbell Road in Branch Township.  (Trial Tr. I, ECF No. 14-7, PageID.634.)  They had two children, one of whom was Kyle Schilling.  Though some of Kyle Schilling's personal items were still at his parent's home, he had moved the previous winter to Kalamazoo, Michigan.  (*Id.*, PageID.634-635.)  Mr. Schilling testified that he had installed a trail camera at the front entrance to the house.  The camera was able to sense both motion and heat signatures, and would take a series

of pictures when it did so.  Mr. Schilling testified that he had purchased the camera because the home had been broken into on September 29, 2010, a month before the facts underlying the instant matter.  (*Id.*, PageID.635-637.)

On October 29, 2010, Mr. Schilling left his home around 9:15 a.m.  His wife had previously left to go to work.  (*Id.*, PageID.638-639.)  Mr. Schilling returned home shortly after noon.  When he pulled into his driveway, he noticed a blue car parked in front of his carport.  (*Id.*, PageID.639.)  Mr. Schilling often had visitors stop by to pay him for his various land contracts, so believing that the car was there to make a payment, Mr. Schilling parked his car and pulled out his receipt book.  (*Id.*, PageID.640-641.)  He walked towards the blue car when Petitioner, who was in the driver's seat, pointed his head out his window and told Mr. Schilling that his nephew, Aaron, was looking for Kyle because Kyle owed him money.  (*Id.*, PageID.641-642.)  Petitioner stated that Aaron was at the door to the house, but when Mr. Schilling looked towards the door, he did not see anyone there. (Id., PageID.643.)  Mr. Schilling went into his house, and noticed that the oak pocket door between the mud room and the rest of the house was partially open.  (*Id.*, PageID.644.)  This was unusual because Mr. Schilling normally kept the door completely closed.  (*Id.*)  His suspicions raised, Mr. Schilling loaded a shotgun that was in the mud room and went into the house. (PageID.645.)  When he entered, he noticed the sliding glass door towards the back of the house was also open.  He testified that this was also unusual, especially because it was cold at that time of year. (*Id.*)

With this added oddity, Mr. Schilling went back outside to the carport, where the blue car was still parked, and wrote down the license plate information of the car.  (*Id.*, PageID.646.)  He then returned to the house and called 911, and told them he thought he was being robbed.  (*Id.*,

- 4 -

PageID.649-650.)  While he was on the phone, he walked back outside, and saw the Petitioner drive away in the blue car.  (*Id.*, PageID.650.)  Mr. Schilling decided to go get his .22 caliber pistol from his cabinet, but found that it was missing.  (*Id.*)  Mr. Schilling stated that the pistol had a blue finish on the barrel and a wooden grip.  (*Id.*, PageID.658.)  He gave the 911 operator the blue car's license plate information and told the operator that his pistol was missing.  (*Id.*, PageID.651-652.)  The operator suggested that Mr. Schilling may want to leave his house for his own safety, and Mr. Schilling hung up the phone and got into his car.  He decided, however, rather than just sit in his car that he should drive around his block and see if he saw anyone on foot in his woods.  (*Id.*, PageID.652.)

Mr. Schilling did not see anyone during his drive and so he returned to his house.  But when he arrived at his driveway he saw the blue car parked at the end of the drive.  (*Id.*, PageID.653-654.)  Petitioner was still in the driver's seat and there was also another occupant, who was subsequently identified as Aaron Rivnack, in the car.  (*Id.*, PageID.654.)  Aaron got out and walked towards Mr. Schilling's car.  He told Mr. Schilling that he was looking for Kyle because Kyle owed him money.  Mr. Schilling told him that he did not see his son very often and that he could not help him.  Aaron then said "Well, tell him Brad Johnson is looking for him and he owes him money." (*Id.*, PageID.654.)  Mr. Schilling wrote down a note on his notepad and asked how he knew Kyle.  Aaron responded that he knew Kyle from jail.  (*Id.*, PageID.655-656.)  Aaron returned to the car, and the car drove away.  (*Id.*, PageID.656.)

Thereafter, Mr. Schilling called 911 a second time.  He told them that he was going to follow the car that he believed had robbed him.  (*Id.*, PageID.656.)  Mr. Schilling followed the car until the 911 operator told him that he could hang up because there was a patrolman close by.  (*Id.*,

- 5 -

PageID.658.)  Thereafter he saw a patrol car arrive and pull the blue car over and Mr. Schilling also pulled over to the side of the road.  (*Id.*, PageID.658.)  He stayed at the scene for about half an hour and spoke to several law enforcement officers.  (*Id.*, PageID.659.)  He told Sergeant Posma that he had a trail camera set up at his house and asked him if he would be interested in seeing what was on the camera.  (*Id.*)  Mr. Schilling went back to his house with the officer and put the camera's SD card into a viewer.  (*Id.*, PageID.659-660.)

Mr. Schilling identified pictures taken from the camera that showed him leaving his house at 9:15 a.m. that morning.  (*Id.*, PageID.662.)  The next picture taken of Mr. Schilling showed a time of 12:26 p.m.  (*Id.*)  There was another picture of him leaving the house at 12:27 p.m., and another picture of Mr. Schilling with his phone at 12:29 p.m.  (*Id.*, PageID.663.)  The camera also took pictures of other individuals who Mr. Schilling testified did not have authority or permission to enter his house or take anything from it.  (*Id.*)  One of those photographs showed Aaron Rivnack walking out of the house carrying Mr. Schilling's pistol.  (*Id.*, PageID.665.)

Connie Blaauw testified that she was a 911 dispatcher.  She received one of the 911 calls and Ms. Carla Inglis Greiner received the other.  (Trial Tr. I, ECF No. 14-7, PageID.690.)  The calls were played for the jury but were not published in the trial transcript.  (*Id.*, PageID.693.)

Warren Cory testified that he towed a blue Chevy Lumina for the Mason County Sheriff's department on October 29, 2010.  (Trial Tr. I, ECF No. 14-7, PageID.695-696.)  Mr. Cory took it from the corner of Gibson and U.S. 10 to the sheriff's department. (*Id.*, PageID.696.)

Deputy Sheriff Shayne Eskew testified that he was dispatched after receiving a report of a home invasion in progress.  (Trial Tr. II, ECF No. 14-8, PageID.706.)  He drove towards the scene and observed the suspect vehicle that was being followed by Mr. Schilling.  (*Id.*)  The officer

then conducted a traffic stop of the suspect car.  (*Id.*, PageID.707.)   The officer testified that he was informed by his dispatcher that there was a missing firearm that had possibly been stolen by the suspects.  The officer ordered Petitioner out of the car, patted him down, handcuffed him, and placed him in his patrol car.  (*Id.*, PageID.709.)   While he did so, Deputy Hanson arrived on scene and ordered Aaron Rivnack out of the car and placed him in the back of another patrol car.  (*Id.*)  Deputy Eskew obtained permission to search the car from Petitioner and the deputy searched the car for a handgun.  They found a blue baseball cap but were unable to find the gun.  (*Id.*, PageID.710.)   After the car was towed, there was a second examination of the vehicle.

At this point, the defense moved to suppress the evidence related to the second examination of the vehicle.  The defense noted there was a statement in the search warrant that was factually inaccurate.  (*Id.*, PageID.715.)   After hearing testimony from the affiant, as well as extensive argument, the trial court denied the defense motion.  (*Id.*, PageID.729.)  Deputy Eskew testified  that the second examination of the vehicle was conducted at the Sheriff's Department pursuant to a search warrant.  (*Id.*, PageID.730.)  He took the baseball cap, which had the University of Michigan logo on it into evidence.  (*Id.,* PageID.731.)  The deputy also recovered a watch, a cell phone, and charging cord, and an insurance document from the car.  (*Id.*)  The watch was found on the driver's side floor of the car.  (*Id.*, PageID.732.)  The deputy then went to the Schilling residence and obtained additional evidence.  He collected latex gloves that were found in a bush and on the ground.  (*Id.*, PageID.740-741.)  The deputy also took photos of shoe impressions located near the pond on the Schilling's property.  (*Id.*, PageID.743.)  He noted that the impressions were similar to the footwear that Aaron Rivnack had been wearing.  (*Id.*, PageID.744.)  Thereafter the deputy obtained the clothing worn by both Petitioner and Aaron Rivnack.  (*Id.*, PageID.748-749.)

Cheryl Schilling testified that she left for work no later than 7:30 a.m. on October 29, 2010. (Trial Tr. II, ECF No. 14-8, PageID.767.)  She was informed about the home invasion by her husband, who said that he would be in touch with her later to find out if she knew where some items might be.  (*Id.*, PageID.768.)  She returned home and went into her bedroom to see what might be missing.  She noticed a lot of her rings were gone, including a white gold ring with diamonds, as well as a gold ring with her birth stone.  (*Id.*, PageID.778-779.)  Later, she noticed that some watches were missing, including one of Kyle's that had been up in his bedroom.  (*Id.*, PageID.772-773.)

Sheila Genter testified that in October 2010 Aaron Rivnack was under the supervision of the Michigan Department of Corrections.  Aaron had been given approval to reside with Petitioner, who was his uncle, for a week while Aaron's mother moved into a new home.  (Trial Tr. II, ECF No. 14-8, PageID.790.)  At the time, Petitioner resided in the city of Ludington. (*Id.*)

Detective Tom Posma testified that he was in his Ludington office when he received a report of a breaking and entering and that the victim was following the suspect vehicle.  (Trial Tr. II, ECF No. 14-8, PageID.794.)  He was told the car was in the Walhalla area, and the officer got in his patrol car to drive to the area.  (*Id.*)  He arrived after the Lumina had already been pulled over and he made contact with Detective Kenney and Deputy Eskew.  (*Id.*, PageID.795.)  Thereafter he went with Mr. Schilling to his residence.  (*Id.*)  Mr. Schilling took the SD card out of his trail camera and put it into a small viewer.  (*Id.*, PageID.796-797.)  After viewing the pictures, Detective Posma radioed Detective Kenney and gave his a description of the clothing worn by the suspects in the pictures.  One was wearing a dark colored shirt, with a pair of blue jeans, tennis shoes, and a Michigan baseball cap.  The other was either bald or had shaved his head bald.  He was wearing gray sweatpants with a lighter gray long sleeve shirt. (*Id.*, PageID.799-800.)  Thereafter, Detective Posma

looked around the area for any possible evidence.  Detective Kenney found some footprints and Detective Posma found a pair of latex gloves that were laying outside, one on the ground and the other in a small bush.  (*Id.*, PageID.800.)

Kyle Schilling testified that he met Petitioner briefly in jail while they were housed in the same cell.  He also knew that Aaron Rivnack was at the same jail, but they did not share a cell. (Trial Tr. II, ECF No. 14-8, PageID.811-812.)  Kyle was also familiar with an individual by the name of Nick Helfrich.  They had been friends for a few years, and Nick had been to his house dozens of times.  Kyle admitted that they would do drugs together.  (*Id.*, PageID.813.)  Kyle testified he was no longer friends with Nick because Nick had stolen several silver coins from his family.  (*Id.*, PageID.814.)  Nick knew where they were kept because he had seen Kyle take some in order to use them to purchase drugs.  (*Id.*)

Nicholas Helfrich testified that he had been friends with Kyle Schilling.  They would buy drugs and get high.  (Trial Tr. II, ECF No. 14-8, PageID.827.)  He was also an acquaintance of Petitioner.  (*Id.*)  In August and September of 2010, Mr. Helfrich spent time with Petitioner.  They were both short on money and so they spoke of ways in which they might obtain some money. During that conversation, Nicholas brought up Kyle's house on North Campbell Road.  (*Id.*, PageID.828-829.) Nicholas told Petitioner that there were some silver coins in the house, and he told Petitioner where the coins were located.  (*Id.*, PageID.829-830.)  A few days later, on September 29, 2010, they drove to Kyle's house, arriving around noon.  Petitioner went into the house, and ten or twenty minutes later returned carrying a box.  Inside the box, Mr. Helfrich noticed a plastic and a canvas bag.  (*Id.*, PageID.830-831, 836.)  They drove to Mr. Helfrich's house, where Petitioner dropped him off.  (*Id.*, PageID.831.)  On their way, Petitioner exclaimed that there were coins in the

- 9 -

box.  (*Id.*, PageID.832.)  The next day Mr. Helfrich drove with Petitioner to Boyer Coins in Muskegon. (*Id.*, PageID.833.) Petitioner stayed in the car while Mr. Helfrich took the coins into the shop.  In exchange for the coins, Mr. Helfrich was given $1,000 in cash and a $3,500 check.  (*Id.*, PageID.834-835.)  They then drove to the bank to cash the check.  (*Id.*, PageID.835-836.)  Mr. Helfrich gave Petitioner the $3,500 from cashing the check and kept the $1,000 in cash he received from the coin shop.  (*Id.*)  Mr. Helfrich was charged with that theft and entered a plea agreement for a reduced sentence in exchange for his truthful testimony.  (*Id.*, PageID.837.)

Detective Michael Kenney testified that he drove to the area of Weaver and US 10 after hearing Officer Eskew make a traffic stop in connection with this case.  (Trial Tr. II, ECF No. 14-8, PageID.854.)  He spoke with Mr. Schilling, who was at the scene, and was informed that Mr. Schilling had installed a trail camera at his house.  Detective Kenney spoke with Detective Posma, and Detective Posma went with Mr. Schilling to Mr. Schilling's home to retrieve the camera.  (*Id.*, PageID.856.)  Detective Kenney also went to the Schilling's home and canvassed the area.  He walked behind the house and down to a pond.  He saw some footprints that appeared to have come from an individual running through the area.  (*Id.*, PageID.856-858.)  The detective returned to the sheriff's office and viewed the images from the trail camera and copied them onto the sheriff office's server.  (*Id.*, PageID.859.)

The prosecution then went through the photographs with the detective.  The photos showed Aaron Rivnack entering and leaving the house perhaps as many as four times.  One showed Aaron leaving the house carrying a pistol with a wooden grip in his right pants pocket.  (*Id.*, PageID.870.)  Another showed Aaron entering the house wearing a latex glove.  (*Id.*, PageID.871-872.)  Another photo showed Petitioner with the front  door cracked open, and the detective testified

that it appeared Petitioner was either peeking his head into the house or preparing to walk inside the house.  (*Id.*, PageID.769-870.)

The captured images show that Mr. Schilling entered his residence only minutes after these pictures were taken.  Mr. Schilling soon exited, holding a cordless phone.  (*Id.*, PageID.873.) Thereafter, the prosecution rested.  (*Id.*, PageID.888.)

After hearing closing arguments and jury instructions, the jury returned a guilty verdict on the charged count.  (Trial Tr. III, ECF No. 14-9, PageID.944.)  Petitioner was sentenced on September 13, 2011, to a prison term of nine to seventy-five years with credit for 61 days served. Petitioner was also ordered to pay restitution.  (Sentencing Hr'g Tr., ECF No. 14-10, PageID.960.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on February 21, 2012, raised two issues:

I.    MR. KNOWLES IS ENTITLED TO A NEW TRIAL WHERE TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN FAILING TO REQUEST AN INSTRUCTION ON THE LESSER INCLUDED OFFENSE OF ENTERING WITHOUT PERMISSION.

II.   MR. KNOWLES' CONVICTION SHOULD BE REVERSED, AS HE WAS DENIED A FAIR TRIAL DUE TO THE TRIAL COURT'S ADMISSION OF UNDULY PREJUDICIAL AND INADMISSABLE EVIDENCE CONCERNING OTHER UNCHARGED, ALLEGED BAD ACTS UNDER MRE 404(B).

(*See* Def.-Appellant's Br. on Appeal, ECF No. 14-11.)  Thereafter on April 2, 2012, Petitioner filed a motion to remand for a *Ginther* hearing.[2]  (Mot. for *Ginther* Hr'g, ECF No. 14-11, PageID.1056-

---

[2]*People v. Ginther*, 212 N.W.2d 922 (Mich. 2008) (providing for an evidentiary hearing to explore a defendant's challenge to the effective assistance of counsel).

1059.)  The court of appeals denied the motion on August 8, 2012.  (Ord. on Mot., ECF No. 14-12,

PageID.1395.)  Petitioner filed a *pro per* supplemental brief, asserting several additional claims:

I.    DID THE TRIAL JUDGE FAIL SUA SPONTE TO (1) GIVE CAUTIONARY INSTRUCTIONS ON TAINTED BIAS AND SELF-SERVING TESTIMONY; (2) FAIL TO GIVE INSTRUCTIONS ON THE DEFENSE['']S THEORY OF THE CASE WHICH WAS SUPPORTED BY THE RECORD EVIDENCE; (3) GAVE LIMITED INSTRUCTIONS ON REASONABLE DOUBT WHICH DEPRIVED DEFENDANT OF DUE PROCESS AS CLEARLY ESTABLISHED BY THE FEDERAL GOVERNING LEGAL STANDARD AND SUPREME COURT PRECEDENT?

II.    WAS THE PROSECUTOR['']S CASE BUILT ON CONJECTURES, PRESUMPTION, THEORIES, AND SUSPICION BASED SOLELY ON CIRCUMSTANTIAL EVIDENCE, MERE PRESENCE AND INSUFFICIENT EVIDENCE WHICH FAILED TO PROVE BY PREPONDERANCE OF THE EVIDENCE AND REASONABLE DOUBT STANDARD ALL OF THE ESSENTIAL ELEMENTS OF THE CHARGED OFFENSE AS CLEARLY ESTABLISHED BY THE FEDERAL GOVERNING LEGAL STANDARD AND SUPREME COURT PRECEDENT?

III.    DID THE TRIAL COURT ABUSE ITS DISCRETION BY DENYING DEFENDANT['']S MOTION FOR CHANGE OF VENUE DUE TO PUBLIC SENTIMENTS AND THE COMPELLING AND PREJUDICIAL SPILLOVER. OF DEFENDANTS INVOLVEMENT IN AN ALLEGED "BOMB THREAT" AND PUBLICALLY EXPOSED OF BEING A FOUR TIME "HABITUAL OFFENDER" WHICH WAS TELEVISED AND PUBLICIZED THROUGHOUT ALL OF LUDINGTON AND THE MASON COUNTY AREA, ALL OF WHICH DENIED DEFENDANT['']S DUE PROCESS TO AN IMPARTIAL JURY AS CLEARLY ESTABLISHED BY SUPREME COURT PRECEDENT AND THE FEDERAL GOVERNING LEGAL STANDARD?

IV.    DID THE PROSECUTOR MIS-STATE THE FACTS, MAKE PURPORTED PERSONAL COMMENTS NOT BY PROOF, PRESENTED ILLEGALLY OBTAINED INADMISSIBLE EVIDENCE AND TESTIMONY JUST TO ASSIST A MOB DOMINATED COMMUNITY AND BLOOD THIRSTY LAW ENFORCEMENT OFFICIALS OBTAIN A TAINTED CONVICTION "BY ANY MEANS NECESSARY" WHICH VIOLATED DEFENDANT['']S DUE PROCESS AND EQUAL

PROTECTION OF THE LAW AS CLEARLY ESTABLISHED BY THE SUPREME COURT PRECEDENT AND THE FEDERAL GOVERNING LEGAL STANDARD?

V.      DID THE TRIAL COURT ABUSE ITS DISCRETION BY DENYING DEFENDANT[']S MOTION TO SUPPRESS "FRUITS OF A POISONOUS TREE" WHICH VIOLATED DEFENDANT[']S FOURTH AM[]ENDMENT RIGHTS BY EXPOSING THE JURY TO PREJUDICIAL EVIDENCE WHICH WAS OUTCOME DETERMINATIVE AS CLEARLY ESTABLISHED BY SUPREME COURT PRECEDENT AND THE FEDERAL GOVERNING LEGAL STANDARD?

VI.     DID TRIAL AND APPELLATE ATTORNEYS ABANDON DEFENDANT DURING THOSE CRITICAL PRETRIAL PREP[A]RATION STAGES OF TRIAL AND ON DIRECT APPEAL OF RIGHTS WHICH RESULTED IN THE VIOLATION OF DEFENDANT[']S SIXTH AMENDMENT RIGHTS RESULTING IN A MISCARRIAGE OF JUSTICE AS CLEARLY ESTABLISHED BY UNITED STATES -V- CRONIC AND EVITTS -V- LUCCY AND THE FEDERAL GOVERNING LEGAL STANDARD?

VII.    IS APPELLANT ENTITLED TO BE RESENTENCED BASED ON (1) CORRECT INFORMATION ON PRESENTENCE INVESTIGATION REPORT; (2) TO DETERMINE WHETHER RESTITUTION SHOULD BE ASSESSED; AND (3) TO DETERMINE WHETHER APPELLANT WAS SUBJECTED TO CRUEL AND UNUSUAL PUNISHMENT BY SENTENCING APPELLANT TO A MAXIMUM OF SEVENTY-FIVE (75) YEARS AS CLEARLY ESTABLISH[ED] BY THE FEDERAL GOVERNING LEGAL STANDARD?

VIII.   WAS THOSE CUMULATIVE ERRORS COMMITTED BY TRIAL AND APPELLATE ATTORNEYS['] ACTIONS OR INACTIONS DURING TRIAL AND ON DIRECT APPEAL OF RIGHTS A MISCARRIAGE OF JUSTICE WHICH PREVENTED DEFENDANT FROM PROVING ACTUAL INNOCENCE AND PRESENTING 'DEAD BANG WINNERS' ON APPELLATE REVIEW AS CLEARLY DETERMINED BY THE FEDERAL GOVERNING LEGAL STANDARD AND SUPREME COURT PRECEDENT?

(*See* Def.-Appellant's Suppl. Br. on Appeal, ECF No. 14-11, PageID.1067-1068.)  By unpublished

opinion issued on November 20, 2012, the Michigan Court of Appeals rejected all appellate

- 13 -

arguments and affirmed Petitioner's convictions and sentences.  (*See* 11/20/12 Mich. Ct. App. Op. (MCOA Op.), ECF No. 14-11, PageID.963-974.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court.  Petitioner raised nine of the ten claims that were presented to and rejected by the Michigan Court of Appeals, excluding only his seventh pro per ground.  (Appl. for Leave to Appeal, ECF No. 14-13, PageID.1399-1411.)  By order entered September 3, 2013, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Ord., ECF No. 14-13, PageID.1396.)

Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655.  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 132 S. Ct. 38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

- 15 -

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.  *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference).   The presumption, however, is not irrebuttable.  *Johnson*, 133 S. Ct. at 1096.  Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review.  *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).   A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.   This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

**Discussion**

I.      Ground I:  Failure to Issue Lesser Included Offense Instruction

Plaintiff argues that his trial attorney rendered ineffective assistance of counsel when he failed to request an instruction on the lesser included offense of entering a dwelling without permission.  He vaguely suggests that due process entitled him to such an instruction.

To the extent that Petitioner claims that he was entitled to an instruction on the lesser included offense, his claim is not cognizable on habeas review.   As Petitioner recognizes in his brief (Mem. of Law in Supp. of Habeas Pet., ECF No. 2, PageID.37-38), the Sixth Circuit Court of Appeals, sitting en banc, has held that the failure to give an instruction on a lesser-included offense, even when requested by counsel, is not of the "character or magnitude which should be cognizable on collateral attack." *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (en banc).  The *Bagby* Court held that failure to instruct on lesser-included offenses in a noncapital case is reviewable in a habeas corpus action only if the failure results in a miscarriage of justice or constitutes an omission inconsistent with the rudimentary demands of fair procedure. *Id.*; *accord Tegeler v. Renico*, 253 F. App'x 521, 524 (6th Cir. 2007); *Todd v. Stegal*, 40 F. App'x 25, 28-29 (6th Cir. 2002); *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002); *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001); *Samu v. Elo*, 14 F. App'x 477, 479 (6th Cir. 2001); *Williams v. Hofbauer*, 3 F. App'x 456, 458 (6th Cir. 2001).  Shortly after the Sixth Circuit decision in *Bagby*, the Supreme Court emphasized that the fact that an instruction was allegedly incorrect under state law is not a basis for habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6 (1983)). Instead, the only question on habeas review is "whether the ailing instruction by itself so infected

the entire trial that the resulting conviction violates due process." *Id.* at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 14 (1973)), *cited in Todd*, 40 F. App'x at 29.

Here, there was no miscarriage of justice or fundamental defect in due process. The jury expressly found that Petitioner had the intent to commit or to aid and abet the commission of a larceny. No record basis exists for concluding that an instruction concerning a lesser included offense would have made any difference. Further, no clearly established Supreme Court authority requires lesser-included offense instructions in non-capital cases. Thus, under the AEDPA, 28 U.S.C. § 2254(d)(1), this claim is not a basis for habeas relief. *Todd*, 40 F. App'x at 28 (citing *Estelle*, 502 U.S. at 71-72).

Petitioner next argues that his attorney's failure to request the instruction on the lesser included offense amounted to ineffective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions

- 18 -

were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

Applying the *Strickland* standard, the Michigan Court of Appeals thoroughly addressed the issue, concluding that the Petitioner had failed to meet the heavy burden of showing that his attorney's performance was ineffective:

> Defendant first asserts that he was denied the effective assistance of counsel when counsel failed to request that the jury be instructed on the lesser-included offense of entering without permission.  Because no evidentiary hearing was held, our de novo review is limited to the existing record. *People v Wilson*, 242 Mich App 350, 354; 619 NW2d 413 (2000).

> Defendant bears the heavy burden of showing that counsel's performance was deficient and that he was prejudiced by the deficiency. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).  Under *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984), defendant must show that counsel's "representation fell below an objective standard of reasonableness," *id.* at 688, and

that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. The relevant inquiry "is not whether a defendant's case might conceivably have been advanced by alternate means," but whether defense counsel's errors were so serious that they deprived the defendant of a fair trial. *People v LeBlanc*, 465 Mich 575, 582; 640 NW2d 246 (2002). Counsel is afforded broad discretion in the handling of cases. *People v Pickens*, 446 Mich 298, 325; 521 NW2d 797 (1994). This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009).

A jury can be instructed on a lesser-included offense "if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support it." *People v Cornell*, 466 Mich 335, 357; 646 NW2d 127 (2002). To convict a defendant of second-degree home invasion, the prosecution must prove that the defendant "(1) entered a dwelling, either by a breaking or without permission, (2) with the intent to commit a felony or a larceny in the dwelling." *People v Nutt*, 469 Mich 565, 593; 677 NW2d 1 (2004). A defendant can be found guilty of breaking and entering without permission, MCL 750.115(1), for "(1) breaking and entering or (2) entering the building (3) without the owner's permission." *People v Silver*, 466 Mich 386, 392; 646 NW2d150 (2002). Thus, the distinguishing element between the two crimes is the intent to commit a felony or larceny in the dwelling. Cf. *Id.* (breaking and entering without permission is a necessarily lesser-included offense of first-degree home invasion).

Defendant's theory of the case was that he drove Aaron Rivnack to the Schillings' residence, but that he believed Rivnack was trying to collect on a debt. Defendant argued he did not enter the home and did not have the intent to commit a larceny, nor was he aware that Rivnack intended to commit a larceny. Consistent with defendant's trial strategy, defense counsel could have determined that if the jury was instructed on an alternative crime that did not include the intent element, it would have increased the likelihood of conviction. A photograph of defendant peering in through the open front door of the residence was in the record, as well as testimony that he admitted opening the door. Only circumstantial evidence of his intent was admitted. It is not objectively unreasonable for counsel to pursue an "all-or-nothing strategy." *People v Armstrong*, 124 Mich App 766[,] 769; 335 NW2d 687 (1983). Moreover, "[a] failed strategy does not constitute deficient performance." *People v Petri*, 279 Mich App 407[,] 412; 760 NW2d 882 (2008). Accordingly, defendant has failed to establish that he was denied the effective assistance of counsel.

(11/20/12 MCOA Op., ECF No. 14-11, PageID.963-964 (footnote omitted).)

Petitioner argues that, because his trial attorney disputed Petitioner's knowledge of Rivnack's intent throughout trial, the court of appeals unreasonably concluded that trial counsel would have left Petitioner with an all-or-nothing strategy by not requesting the lesser included offense instruction.  Petitioner misunderstands the court of appeals' reasonable point.  Precisely because Petitioner staunchly maintained that he did not know that Rivnack had any criminal intent, counsel had a reason not to invite the jury to convict Petitioner of a crime that did not require intent. As the court of appeals held, the decision not to ask for the lesser included instruction was strategic and patently reasonable.

Under these circumstances, Petitioner has not and cannot overcome the double deference owed to the court of appeals' resolution of the issue.  Accordingly, I recommend that habeas relief be denied on Ground I of the petition.

## II.    Ground II:  Admission of Bad Acts Evidence

In his second ground for habeas relief, Petitioner argues that he was denied a fair trial when the prosecution introduced and the trial court allowed the admission of uncharged other bad acts under MICH. R. EVID. 404(b).[3]  Specifically, he objects to the admission of Helfrich's testimony that Petitioner and Helfrich had robbed the same home one month before the charged home invasion.

There is no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence.  In *Estelle v. McGuire*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process.  *Estelle*, 502 U.S. at 75. The Court stated in a footnote that, because

---

[3] As noted above, the Court does not consider Petitioner's unexhausted and abandoned claim that counsel was ineffective in failing to conduct and complete an investigation into Helfrich's testimony.

it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime.  *Id.* at 75 n.5.  While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.  The Sixth Circuit has found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence."  *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Because there was no constitutional violation in the admission of evidence of other bad acts, the state court's decision to admit the evidence was "far from" an unreasonable determination of the law and facts under the circumstances.  *Clark v. O'Dea*, 257 F.3d 498, 502 (6th Cir. 2001); *see also Bugh*, 329 F.3d at 512.

III.    Ground III(A):  Denial of Motion to Change Venue

In the first half of his third ground for habeas relief, Petitioner contends that the trial court should have granted his motion to change venue, because four articles had appeared in the Ludington Daily News, which included information that Petitioner was a fourth-offense felony offender and may have been involved in a bomb threat.  The Michigan Court of Appeals rejected the claim, holding that Petitioner had waived the issue because he did not use all of his peremptory challenges and expressed his satisfaction with the jury.  (11/20/17 MCOA Op., ECF No. 14-11, PageID.969.)

A.    Pretrial Publicity

It is a "basic requirement of due process" guaranteed by the right to trial by jury that the "criminally accused [receive a] fair trial by a panel of impartial, 'indifferent' jurors." *Goins v. McKeen*, 605 F.2d 947, 951 (6th Cir. 1979) (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)).  In a number of decisions on the subject of pretrial publicity, the Supreme Court distinguished between "cases involving presumed  prejudice – when the setting of the trial is inherently prejudicial, – and actual prejudice  – when review of both the jury *voir dire* testimony and the extent and nature of media coverage indicates a fair trial was impossible." *Ritchie v. Rogers*, 313 F.3d 948, 952 (6th Cir. 2002) (internal quotations and citations omitted); *see also Nevers v. Killinger*, 169 F.3d 352 (6th Cir. 1999), *abrogated on other grounds by Harris*, 212 F.3d at 943.

In *Murphy v. Florida*, 421 U.S. 794 (1975), the Supreme Court discussed three of its earlier cases in which the Court found circumstances warranting a presumption of prejudice: *Rideau v. Louisiana*, 373 U.S. 723 (1963), *Estes v. Texas*, 381 U.S. 532 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966).  *Rideau* involved the televising of an in-jail, 20-minute interrogation of the defendant by the police in which the defendant confessed to the murder for which he was subsequently convicted.  The Court concluded that Rideau presumptively could not have received a fair trial in that parish "because it considered the trial under review 'but a hollow formality' – the real trial had occurred when tens of thousands of people, in a community of 150,000, had seen and heard the defendant admit his guilt before the cameras." *Murphy*, 421 U.S. at 799.  The trial in *Estes* had been conducted in a "circus atmosphere," where the courtroom was overrun with television equipment.  *Murphy*, 421 U.S. at 799.  *Sheppard* similarly involved extremely inflammatory publicity, as well as a carnival-like atmosphere in the courtroom created by the media presence.

- 23 -

*Murphy*, 421 U.S. at 799.  Nevertheless, the *Murphy* Court recognized the limitations of its decisions in *Estes* and *Shepard*:

> The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. They cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process.

*Murphy*, 421 U.S. at 799.

In the absence of the "televised confession amounting to a trial" or "carnival atmosphere," the Supreme Court has inferred prejudice from the nature and extent of the publicity and the juror voir dire testimony.  In *Irvin*, 366 U.S. 717, the defendant was tried in a small community that was widely aware of his prior convictions, his confession to 24 burglaries and six murders (including the one for which he stood trial) and his unaccepted offer to plead guilty in order to avoid a death sentence.  *Murphy*, 421 U.S. at 798 (citing *Irvin*).  In addition, eight of the twelve empaneled jurors in *Irvin* had already formed the opinion that the defendant was guilty.  *Id.* Furthermore, 268 of the 430 members of the venire were excused because they indicated an opinion as to the petitioner's guilt.  Under such circumstances, the Court found prejudice from pretrial publicity.  Again, however, in reaching its decision, the *Irvin* Court noted the limits of the decision:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 722-23.

- 24 -

Since *Irvin*, the Supreme Court has abandoned the idea that a "presumption of prejudice" arises from "pervasive publicity." *Jackson v. Houk*, 687 F.3d 723, 732 (6th Cir. 2012) (citing *Mu'Min v. Virginia*, 500 U.S. 415 (1991), and *Skilling v. United States*, 561 U.S. 358 (2010)). In *Mu'Min*, 500 U.S. at 433, and *Skilling*, 561 U.S. at 386, the Supreme Court "replaced the presumption of prejudice based on pervasive publicity and the need for extensive voir dire in such circumstances with a constitutional rule of deference to the trial judge with regard to voir dire and change of venue." *Jackson*, 687 F.3d at 733.  In deciding *Mu'Min*, the Supreme Court expressly rejected the concept that a trial court must separately interrogate each juror about what they may have read or heard about the case. *Id.* (rejecting as a constitutional standard STANDARDS FOR CRIMINAL JUSTICE OF THE AMERICAN BAR ASSOCIATION § 8-3.5 (2d ed. 1980)).  Instead, the Court "stressed the wide discretion granted to the trial court in conducting voir dire in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias." *Mu'Min*, 500 U.S. at 427. Similarly, in *Skilling*, the Court reiterated that evaluation of pretrial publicity primarily lies with the trial court, because of that court's unique ability to appraise "the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty," none of which is captured by the trial transcript.  561 U.S. at 386.  "A trial court's findings of juror impartiality may be overturned only for manifest error."  *Mu'Min*, 500 U.S. at 428 (internal citations and quotation marks omitted).

Applying the deference owed under *Mu'Min* and *Skilling*, this Court concludes that Petitioner has not been deprived of due process.  The instant case clearly does not present an extreme circumstance in which the criminal proceedings were utterly corrupted by media coverage, as they were in *Irvin*.  Only four articles had appeared in the paper, not more than 40 as in *Irvin*, 366 U.S.

- 25 -

at 725.  In addition, in contrast to *Irvin* and *Skilling*, Petitioner was not subjected to extensive damaging radio and television broadcasts.  Further, unlike *Estes* and *Shepard*, this case did not involve a media-created carnival atmosphere in the courtroom during trial, nor did it involve the televising of a videotaped confession as found in *Rideau*.  Instead, the trial court in the instant case discussed with the entire jury panel that four articles had been published in the local newspaper, and it advised the jury that sometimes matters come out in a newspaper article that may be positive or negative, but are not appropriate to come out at trial.  (Trial Tr. I, ECF No. 14-7, PageID.514, 617-618.)  The court asked jurors to identify if they had been subscribers to the Ludington Daily News over the last two years.  The trial court subsequently removed from the jury venire all 23 prospective jurors who subscribed to the Ludington Daily News.  (*Id.*, PageID.517, 606-607.)  In addition, the Court asked prospective jurors whether any of them had a problem, positive or negative, in fairly deciding a case about Petitioner.  Five prospective jurors volunteered that they would have a problem, though a number of those jurors had favorable feelings toward Petitioner.  (*Id.*, PageID.508-510, 512.)  No other prospective juror indicated that they had a bias one way or the other.  All but one juror who had expressed some concern about being fair were subjected to further questioning at the time they were called to the jury box.  Four of the five were dismissed from the panel.  (*Id.*, PageID.522-523, 526, 536, 573.)  In addition, all of the jurors were asked about their ability to be fair and about whether they had preconceived notions.  (*Id.*, PageID.541, 544-545, 566-572, 602.)  No juror actually sworn to the jury expressed having preconceived notions.  Further, the judge carefully instructed the jury not to consider information that came from any source other than the courtroom, explaining that news reports could contain false information that was not tested in court.  (*Id.*, PageID.617-618; Trial Tr. III, ECF No. 14-9, PageID.924.)

Under all of these circumstances, and applying the constitutionally required deference to the trial judge's determinations, the Court finds no error, much less manifest error, in the state court's handling of the issue of pretrial publicity.  *See Mu'Min*, 500 U.S. at 427; *Skilling*, 561 U.S. at 386.  The trial court reasonably managed the pretrial publicity and ensured through exclusion of potential jurors who subscribed to the newspaper and voir dire questions that the jury was unbiased and would render its verdict solely on the evidence produced at trial.

Petitioner's claim fails for an additional reason.  In the instant case, trial counsel had ample opportunity to inquire further into juror bias.  The trial court placed no restrictions on defense counsel's voir dire.  Yet counsel, after asking numerous questions, expressed satisfaction with the jury.  Given that Petitioner expressly elected to drop his unexhausted claim of ineffective assistance of counsel for failure to ask further questions, he has waived any claim that jurors should have been subjected to further questioning about their exposure to pretrial publicity.

For both reasons, Petitioner is not entitled to relief on his third habeas ground.

IV.     Ground III-B:  Prosecutorial Vouching

Petitioner argues that the prosecutor deprived him of his right to a fair trial by vouching for the trustworthiness of witness Helfrich, who testified that Petitioner had helped him commit the first home invasion at the Skillings' house.  Petitioner complains about the following portion of the prosecutor's closing argument:

> We also know that there was a prior Home Invasion a month previous. Nick Helfrich told us that.
>
> What sort of witness was Nicholas Helfrich?  We know he had his oranges on.  He was in jail clothes.  He admitted his problems.  He admitted he has a drug problem.  Drug problems landed him in prison.

- 27 -

He admitted that he knew the Schillings.  He knew where the coin collection was kept.  He testified under oath that he needed money.  He had no job.  Clearly he had a drug habit.

Was he argumentative?  Was he hostile?  Was he, did he try to twist around the questions from the lawyers?  You had a chance to judge his testimony.  Did he appear to be a witness up there who was trying to tell everything straight?  Was he up front about it?

I argue that he was up front.  I argue that his testimony is something that you should seriously, that you should strongly believe.

He does have a deal.  He does.  He got a new felony conviction for Receiving And Concealing Stolen Property.  And he's getting a 12 month sentence for that.  He could have gotten up to -- he could have gotten longer.  And he has to pay the restitution to the Schillings for the stolen coins.

And part of his agreement was to provide truthful testimony here.  If he doesn't provide truthful testimony here, his plea agreement is voidable.  It can be taken away from him.  It can be pulled away.  And if it gets pulled away, he's subject to a greater exposure.

He's a flawed person.  There's no question about it.  He's flawed.  He's got lots of blemishes.  He's got problems.

But was his testimony consistent?  Was his testimony coherent?  Did his testimony make sense?  Is his testimony believable?

I argue to you that his testimony was believable.  That he and Donald Knowles had gone to the Schilling house a month before and relieved them of the silver.  And that Don Knowles, along with Nick Helfrich, went to Muskegon where the silver was cashed in and $4,500[] was obtained.

And it's with that backdrop that the Breaking And Entering, the Home Invasion on October 29th all comes into context.  Because of that, Martin Schilling gets a trail camera.

(Trial Tr. III, ECF No. 1409, PageID.898-899.)[4]

---

[4] The Court notes that, in his appeal to the Michigan Court of Appeals, Petitioner raised additional concerns about the prosecutor's conduct.  However, in his memorandum of law in support of his habeas application, Petitioner only raises a concern with the quoted closing argument.  (Mem. of Law in Supp. of Pet., ECF No. 2, PageID.56-59.)

On direct appeal, the court of appeals concluded that Petitioner had failed to lodge a contemporaneous objection, in violation of established procedural requirements.  Therefore, the court reviewed his claim only for plain error.  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).  In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim.  It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial.  *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369-70 (Mich. 1985).  A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee v. Kemna*, 534 U.S. 362, 385 (2002). Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court.  *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Taylor v. McKee*, 649 F.3d 446, 450 (6th Cir.

- 29 -

2011); *Awkal v. Mitchell*, 613 F.3d 629, 648 (6th Cir. 2010); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).   Accordingly, review by this Court is barred unless Petitioner can show cause and prejudice.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 485 (1986).

After expressly noting Petitioner's default in failing to object, the Michigan Court of Appeals then reviewed Petitioner's claim for plain error, finding none.  In this circuit, "plain error review does not constitute a waiver of state procedural default rules."  *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000) (citations omitted); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (state court's alternative holding on the merits does not require federal court to disregard the procedural bar); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991) (same); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989) (claim is defaulted even where the state court may excuse the default for "manifest injustice"); *Federico v. Yukins*, No. 93-2424, 1994 WL 601408, at *3-*4 (6th Cir. Nov. 2, 1994) (same, for "miscarriage of justice").  As a consequence, Petitioner's claim concerning the prosecutor's alleged misconduct is procedurally defaulted.

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice.  *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52.  The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence.  *House*, 547 U.S. at 536. A habeas

- 30 -

petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Petitioner does not argue cause and prejudice that would excuse his default. Nor does he demonstrate that he is actually innocent by new, reliable evidence. As a consequence, he is not entitled to relief on habeas review.

Moreover, even if his claim were not procedurally barred, Petitioner would not be entitled to relief on his claim. In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13; *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512

- 31 -

(6th Cir. 2003)).  Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'"  *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974)).  Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (internal quotation omitted).

The federal courts have generally recognized two types of objectionable vouching.  *See Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008); *Brown v. McKee*, 231 F. App'x 469, 478 (6th Cir. 2007) (citing *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)); *but see Wogenstahl v. Mitchell*, 668 F.3d 307, 328-29 (6th Cir. 2012) (treating the two aspects of vouching as part of a single standard).  The first type impermissibly places the government's prestige behind the witness to bolster the witness' credibility.  *Francis*, 170 F.3d at 550; *United States v. Carroll*, 26 F.3d 1380, 1388-89 (6th Cir. 1994); *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992).  In the second type of impermissible vouching, also known as bolstering, the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt.  *See Francis*, 170 F.3d at 551; *United States v. Medlin*,

- 32 -

353 F.2d 789, 796 (6th Cir. 1965); *Henderson v. United States*, 218 F.2d 14, 19 (6th Cir. 1955). Neither type of vouching is involved in this case.[5]

Petitioner's claim does not meet the high standard to establish a due process violation through improper vouching for a witness. Rather, the prosecutor highlighted the aspects of Helfrich's testimony that suggested his credibility: his demeanor, his admissions of his own failings, his failure to twist the lawyer's questions, and his lack of hostility or argument under questioning. (Trial Tr. III, ECF No. 14-9, PageID.898.) It is plain that the prosecutor's comments were directed towards convincing the jury that Helfrich was credible. It is appropriate for the prosecutor to invite the jury to examine the testimony they have heard at trial, draw reasonable inferences, and examine the motives witnesses may have for lying. *See Cantrell v. Gray*, No. 84-3686, 1986 WL 16540, at *3 (6th Cir. Feb. 7, 1986); *see also United States v. Eltayib*, 88 F.3d 157, 173 (2d Cir. 1996); *Rodriguez v. Peters*, 63 F.3d 546, 564 (7th Cir. 1995); *Kappos v. Hanks*, 54 F.3d 365, 368 (7th Cir. 1995). Moreover, instructing a jury that the arguments are not evidence has sometimes been deemed to cure any improprieties in a closing argument. *Byrd v. Collins*, 209 F.3d 486, 538 (6th Cir. 2000). Further, instructing the jury regarding the methods it should use to evaluate credibility helps to cure any improprieties. *Id.* In this case, the trial court gave both instructions. (*See* Trial Tr. I, ECF No. 14-7, PageID.613-614; Tr. III, ECF No. 14-9, PageID.923, 925-926.)

---

[5]The Court observes that, notwithstanding the Sixth Circuit's continuing application of its own precedent on vouching, *see Wogenstahl*, 668 F.3d at 328-29 (citing *Johnson v. Bell*, 525 F.2d 466, 482 (6th Cir. 2008)), the Supreme Court has not directly held that vouching amounts to prosecutorial misconduct. Given the Supreme Court's recent admonitions to the courts regarding the limits of clearly established general principles, it is doubtful that vouching has been clearly established by the Supreme Court as a due process violation. *See, e.g., Lopez v. Smith*, 135 S. Ct. 1, 3 (2014) (holding, with respect to a claim of self-representation, that "[c]ircuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.'") (quoting *Marshal v. Rodgers*, 133 S. Ct. 1446, 1450 (2013); *White*, 134 S. Ct. at 1703 (same, respecting a claim regarding the privilege against self-incrimination); *Parker*, 132 S. Ct. at 2155 ("The highly generalized standard for evaluating claims of prosecutorial misconduct set forth in *Darden* bears scant resemblance to the elaborate, multistep test employed by the Sixth Circuit here.").

In addition, the prosecutor committed no error in discussing the content of the plea agreement.  The Sixth Circuit has recognized that simply inquiring as to the existence of a term in the plea agreement regarding truthful testimony does not violate due process.  *See United States v. Reid*, 625 F.3d 977, 984 (6th Cir. 2010) (concluding that "[b]ecause the prosecutor limited his questions and comments to th[e] facts [of the plea agreements] and did not imply any special knowledge regarding the credibility or truthfulness of the cooperating witnesses, the prosecutor did not improperly vouch for the witnesses."); *United States v. Tocco*, 200 F.3d 401, 416-17 (6th Cir. 2000) (introduction of plea agreement which contained requirement of truthful testimony, standing alone, was not improper); *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999) ("We have allowed a prosecutor to refer to the plea agreement of a testifying witness. . . .  The prosecutor may elicit testimony about its terms, attack the credibility of the witness because of it and even refer to the plea agreement of a government witness in an attempt to deflect defense counsel's use of the agreement to attack the witness's credibility.") (citation omitted).

Here, the reference to the plea agreement and to the agreement's requirement of truthful testimony was based solely on the evidence and did not imply that the agreement ensured truthfulness or that the prosecutor had additional information.  Instead, as the court of appeals noted, evidence about the plea agreement was responsive to defense counsel's opening statement, in which counsel attacked Helfrich's credibility because Helfrich had obtained a benefit under the plea agreement in exchange for his testimony.  (Tr. I, ECF No. 14-7, PageID.629-630.)  In addition, the reference to the plea agreement was part of the prosecutor's acknowledgment of Helfrich's flawed character, in the context of arguing why he should be believed.

- 34 -

The Michigan Court of Appeals' rejection of Petitioner's claim of prosecutorial misconduct therefore constituted a reasonable application of clearly established Supreme Court precedent. Petitioner falls far short of overcoming the particular deference owed to the state court's determination on a claim of prosecutorial misconduct. *Parker*, 132 S. Ct. at 2155.

Accordingly, Petitioner's claim of prosecutorial misconduct is both procedurally defaulted and without merit. I therefore recommend that habeas ground III(B) be denied.

## V.    Ground IV:  Denial of Motion to Suppress

In his fourth ground for habeas relief, Petitioner makes a variety of contradictory claims. In the caption of his claim, he argues that the "trial court abused its discretion by denying [Petitioner's] motion to suppress 'fruits of a poisonous tress' which violated [Petitioner's] fourth amendment rights by exposing the jury to prejudicial evidence that was outcome determinative . . . ." (Mem. in Supp. of Pet., ECF No. 2, PageID.60.) In the next two pages of his argument, Petitioner suggests that the search warrant was based on a false affidavit, which indicated that the affiant had received a call from Mr. Schilling about Mrs. Schilling's discovery of a missing watch not previously reported. Nevertheless, at trial, Mrs. Schilling testified that she only realized the watch was missing once shown a photograph taken after the car had been searched. Petitioner claims that Mrs. Schilling's testimony demonstrates that the affidavit contained a false statement. (*Id.*, PageID.60-61.) However, on the third page of his argument, Petitioner states, "This Petitioner does not imply that the Court's ruling is incorrect as to the search warrant . . . ." (*Id.*, PageID.62.) Yet Petitioner claims that the evidence of the watch "created a prejudicial environment" that affected the jury. (*Id.*) Presumably, Petitioner intends to argue that, even if the warrant was initially supported by probable cause, the subsequent proof of the false averment rendered the warrant invalid in hindsight.

- 35 -

Petitioner's claim is barred by the doctrine of *Stone v. Powell*, 428 U.S. 465 (1976); *see also Queen v. Scroggy*, 99 F.3d 1302, 1332 (6th Cir. 1996) (noting that it is well-settled that *Stone v. Powell* bars Fourth Amendment claims). In *Stone v. Powell*, the Supreme Court held that federal habeas review is not available to a state prisoner alleging that his conviction rests on evidence obtained through an unconstitutional search or seizure, as long as the state has given the petitioner a full and fair opportunity to litigate the Fourth Amendment claim. *Id.*; *see also Rashad v. Lafler*, 675 F.3d 564, 570 (6th Cir. 2012).

In order for the rule of *Stone v. Powell* to apply, the state must have provided, in the abstract, a mechanism by which to raise the Fourth Amendment claim, and the presentation of the claim in the case before the court must not have been frustrated by failure of that mechanism. *See Gilbert v. Parke*, 763 F.2d 821, 823 (6th Cir. 1985). If these two inquiries are satisfied, federal habeas review of the Fourth Amendment claim is precluded, even if the federal court deems the state-court determination of the claim to have been in error. *Id.* at 824; *accord Jennings v. Rees*, 800 F.2d 72 (6th Cir. 1986); *Markham v. Smith*, 10 F. App'x 323, 326 (6th Cir. 2001).

In the present case, Petitioner cannot satisfy either prong of the *Stone v. Powell* standard. First, it is beyond dispute that Michigan has a state procedural mechanism that presents a defendant a full opportunity to raise a Fourth Amendment claim before trial. Even before the United States Supreme Court decided that the federal exclusionary rule applied to state criminal proceedings, the Michigan courts applied the exclusionary rule to the fruits of unconstitutional searches and seizures. *See People v. Margelis*, 186 N.W. 488 (Mich. 1922). After *Mapp v. Ohio*, 367 U.S. 643 (1961), the Michigan courts consistently have acknowledged their duty, under both the federal and state constitutions, to suppress evidence seized in violation of the Fourth Amendment.

*See, e.g., People v. David*, 326 N.W.2d 485, 488 (Mich. Ct. App. 1982).  Consequently, Michigan affords criminal defendants a vehicle by which to raise Fourth Amendment challenges.

Second, to satisfy the remaining prong of *Stone v. Powell*, Petitioner must allege facts showing that the state corrective mechanism has somehow broken down.  *See, e.g., Agee v. White*, 809 F.2d 1487, 1490 (11th Cir. 1987) (habeas review not barred when state appellate court completely ignored Fourth Amendment claim).  The Sixth Circuit pointedly has held that the doctrine of *Stone v. Powell* applies, even if the federal court deems the state-court determination of the Fourth Amendment claim to have been in "egregious error."  *Gilbert v. Parke*, 763 F.2d at 824 (citing *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982)).

Petitioner has not alleged any facts showing that the state's mechanism has broken down.  Rather, it is clear that Petitioner exercised his right to challenge the validity of the warrant on two occasions.  On the morning of the second day of trial, after review of Mr. Schilling's testimony in comparison with the transcript from accomplice Rivnack's trial, defense counsel moved to quash the discovery of the watch, arguing that Detective Kenney's affidavit in support of the search warrant was false.  (Trial Tr. II, ECF No. 14-8, PageID.714-715.)  Detective Kenney was called to the stand.  Kenney testified that he had honestly averred that the Schillings had reported that jewelry and a watch were missing.  He stated that, while he was preparing the search warrant on the evening of the theft, he received a call from Mr. Schilling, indicating that his wife had noticed that she was missing a gold ring and a watch.  (*Id.*, PageID.723-727.)  Having heard the testimony and considered the arguments, the court denied the motion to quash evidence of the watch.  (*Id.*, PageID.729.)  After Mrs. Schilling subsequently testified that she did not report a watch missing until after she was shown a photograph of the watch, defense counsel moved for a mistrial.  (*Id.*,

PageID.782-783.)  In support of his motion, counsel again argued that the officers had no good faith basis for seeking the search warrant, because Mr. Schilling could not have called them about a missing watch when Mrs. Schilling did not know it was missing until after the warrant was executed. (*Id.*)  The prosecutor argued that, even without the allegation about the watch, application for the warrant sufficient contained averments to support issuance of the warrant.  The court again ruled that the warrant was properly issued and that the discrepancy undoubtedly was caused by a failure of memory.  The court therefore denied the motion for mistrial.  (*Id.*, PageID.785-788.) The record demonstrates that the trial court fully considered Petitioner's motion to suppress and motion for mistrial.  On appeal, the Court of Appeals also thoroughly reviewed Petitioner's claim and determined that it lacked merit.  Petitioner applied for leave to appeal to the Michigan Supreme Court, which denied his application.

Taken together, it is apparent that the state-court mechanism for considering Fourth Amendment claims did not break down and was available to and utilized by Petitioner.  Therefore, even if this Court were to disagree with the determination of the Michigan courts, that disagreement would be insufficient to satisfy the second prong of the Sixth Circuit standard.  *Gilbert*, 763 F.2d at 824.

Because Petitioner has failed to demonstrate either prong of *Stone v. Powell*, his claim of illegal search and seizure is barred on habeas review.

## Certificate of Appealability

Even though I have concluded that Petitioner's habeas petition should be denied, under 28 U.S.C. § 2253(c)(2), the Court must also determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing

- 38 -

of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals

has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263

F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each

claim" to determine whether a certificate is warranted.  *Id.* at 467.

      I have examined each of Petitioner's claims under the standards set forth by the

Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  Under *Slack*, to warrant a grant of the

certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's

assessment of the constitutional claims debatable or wrong." *Id.*  "A petitioner satisfies this standard

by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve

encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying

this standard, the Court may not conduct a full merits review, but must limit its examination to a

threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

      I find that reasonable jurists could not conclude that this Court's denial of Petitioner's

claims would be debatable or wrong.  Therefore, I recommend that a certificate of appealability

should be denied.

**<u>Recommended Disposition</u>**

      For the foregoing reasons, I respectfully recommend that the habeas corpus petition

be denied.  I further recommend that a certificate of appealability be denied.

Dated:  November 8, 2017                    /s/ Ray Kent
                                          RAY KENT
                                          United States Magistrate Judge

**<u>NOTICE TO PARTIES</u>**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).